# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| TRACY LANE BEATTY<br>*Plaintiff,*<br><br>v.<br><br>BRYAN COLLIER,<br>Executive Director, Texas Department of<br>Criminal Justice;<br><br>BOBBY LUMPKIN,<br>Director, Correctional Institutions Division,<br>Texas Department of Criminal Justice;<br><br>DANIEL DICKERSON,<br>Senior Warden, Polunsky Unit<br>Livingston, Texas;<br>    *Defendants.* | Civil Case No.<br><br><br><br>**DEATH PENALTY CASE**<br><br>**EXECUTION SCHEDULED FOR<br>NOVEMBER 9, 2022** |

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas Bar No. 24084578

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

James William Marcus
Texas Bar No. 00787963
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin, Texas 78705
512-232-1475
512-232-9197 (fax)
jmarcus@law.utexas.edu

## I.   INTRODUCTION

1.   Texas has executed 576 people since it resumed executions in 1982. To the best of counsel's knowledge, each of those individuals was able to be evaluated by mental health professionals while not being handcuffed, if such an evaluation was sought. Those individuals were then able to use that information to seek clemency or pursue other available litigation.

2.   Mr. Beatty has significant red flags for mental impairments that could create a compelling case for clemency and possibly establish that his execution would be unconstitutional. Yet, until now Mr. Beatty had never been evaluated in person by a mental health professional that was a member of his defense team.

3.   Mr. Beatty attempted to use the routine procedures in existence for years to obtain uncuffed mental health evaluations and did so with ample time to utilize those results for clemency or other litigation.

4.   Defendants, despite the lack of any formal policy, recently created a new requirement for a court order to permit uncuffed mental health evaluations. They then opposed Mr. Beatty's request for such an order, which as far as undersigned counsel are aware was the first time they have done so when a death row inmate attempted to get one.

5.   Defendants' actions created the current constitutional crisis. Unlike those executed before him, Defendants will not allow Mr. Beatty to be uncuffed during expert evaluations. Mr. Beatty merely asks for the same opportunity others have received—and in some instances still receive, although not Mr. Beatty.

6.   Recent preliminary evaluations were significantly hindered by Mr. Beatty being handcuffed, yet they identified signs of mental illness and impairments in his brain functioning that can

only be adequately assessed if he is allowed to participate in testing, which requires his handcuffs to be removed.

7.      Defendants' refusal to allow Mr. Beatty uncuffed mental health evaluations violates his right to equal protection under the law and interferes with his ability to present information for clemency, his access to courts, and his right to counsel. Mr. Beatty brings this action pursuant to 42 U.S.C. § 1983 to remedy these violations.

## II.  JURISDICTION AND VENUE

8.      This action is brought pursuant to 42 U.S.C. § 1983. This Court also has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because all Defendants reside or have business offices in the State of Texas and at least one Defendant resides or has business offices in this District.

## III. PARTIES

10.     Plaintiff Tracy Lane Beatty is incarcerated under a sentence of death and is under the supervision of the Texas Department of Criminal Justice ("TDCJ"). He is confined at the Polunsky Unit, located at 3872 FM 350 South, Livingston, Texas, 77351.

11.     Defendant Bryan Collier is the Executive Director of TDCJ. Defendant Collier is the commanding officer of all TDCJ employees and contractors and is responsible for their conduct. He is responsible for protecting the constitutional rights of all persons and entities under TDCJ's supervision. He authorizes or condones the unconstitutional polices or practices at issue. Defendant Collier has business offices located at 861 A IH 45 North, Huntsville, Texas 77320.

12.     Defendant Bobby Lumpkin is the Director of the Correctional Institutions Division of TDCJ. Defendant Lumpkin is responsible for the supervision and administration of the state prison system and is responsible for protecting the constitutional rights of all TDCJ inmates, including those on death row. He authorizes or condones the unconstitutional polices or practices at issue. Defendant Lumpkin's business address is P.O. Box 99, Huntsville, Texas, 77342.

13.     Defendant Daniel Dickerson is the Senior Warden of the Polunsky Unit. Defendant Dickerson oversees the Polunsky Unit and is responsible for protecting the constitutional rights of all inmates at the Polunsky Unit, including those on death row. He authorizes or condones the unconstitutional polices or practices at issue. Defendant Dickerson has offices located at 3872 FM 350 South, Livingston, Texas, 77351.

14.     All Defendants are sued in their official capacities as representatives of TDCJ.

15.     In all respects relevant to this action, all Defendants are state officials acting under color of state law.

## IV. FACTS

### Background

16.     Mr. Beatty was sentenced to death on August 10, 2004, following his conviction for capital murder in the 241st District Court of Smith County, Texas. Mr. Beatty challenged his conviction and sentence on direct appeal and in state and federal post-conviction proceedings.

17.     On August 9, 2022, the United States District Court for the Eastern District of Texas appointed the Federal Public Defender's Office for the Northern District of Texas ("FPD")

as co-counsel to represent Mr. Beatty under 18 U.S.C. § 3599. *Beatty v. Director*, No. 4:09-cv-00225, Doc. 70 (E.D. Tex. Aug. 9, 2022).

18.     Mr. Beatty is scheduled to be executed on November 9, 2022.

#### TDCJ's Procedure for Contact Visits with Members of the Legal Team

19.     TDCJ has a routine and straightforward procedure in place for a death row inmate to participate in contact visits with approved mental health professionals.

20.     The initial step requires an I-164 form, "Application to Visit TDCJ Inmate as Attorney/Consul Representative," to be submitted to TDCJ's Access to Courts Division. The proposed expert must be sponsored by an attorney as their representative. This form is used by Access to Courts to investigate the proposed representative to determine whether they will be approved to enter TDCJ facilities as a legal representative.

21.     If the I-164 form is approved, the representative must receive further approval for a contact visit with the requested inmate. An I-165S form, "Attorney Initiated Contact Visit for Specialized Professional," must be sent to the relevant unit. That form requires the representative to list any items that they want to bring into the unit. The relevant unit then determines whether to permit a contact visit between the inmate and designated representative.

22.     If approved for a contact visit at the Polunsky Unit, the representative meets with the inmate in a visitation room inside the prison that locks from the outside. The visit is monitored through a window by a TDCJ guard stationed outside of the room.

23. For years, TDCJ has uncuffed the inmate at the representative's request during an approved contact visit, without requiring a court order or any other formal process. This allowed the inmate to participate in various testing that was warranted.

24. Defendants have no formal policy that requires death row inmates to be handcuffed during approved contact visits. Counsel submitted a Public Information Act request to TDCJ for any policies pertaining to whether inmates, including those on death row, are required to remain handcuffed during contact visits. Ex. 1. TDCJ responded that they had no policies responsive to the request. Ex. 2.

25. Despite the lack of a formal policy, Defendants recently began—in some instances, but not all—requiring a court order for death row inmates to be uncuffed during approved contact visits.

26. Some petitioners have obtained federal court orders that Defendants now require for an uncuffed evaluation *See, e.g.*, Order Granting Second Unopposed Motion for Temporary Unshackling, *Ricks v. Lumpkin*, No. 4:30-cv-1299, Doc. 31 (N.D. Tex. April 19, 2022); Order Granting Unopposed Motion for Temporary Unshackling, *Ricks v. Lumpkin*, No. 4:30-cv-1299, Doc. 26 (N.D. Tex. March 4, 2022). Defendants have also requested that death row inmates be uncuffed during expert evaluations when it suits their litigation needs. *See, e.g.*, Director's Motion to Compel, *Panetti v. Lumpkin*, No. 1:04-cv-00042, Doc. 264 (W.D. Tex. June 29, 2022); Director's Unopposed Motion to Compel, *Washington v. Lumpkin*, No. 4:07-cv-721, Doc. 226 (S.D. Tex. Feb. 15, 2022).

**Mr. Beatty's Attempts to Obtain Uncuffed Mental Health Evaluations**

27.   Mr. Beatty attempted to use the well-established procedure for obtaining uncuffed mental health evaluations. He did so at a time when he would have been able to utilize the results of those evaluations to pursue clemency and remaining judicial remedies.

28.   Mr. Beatty has mental health and cognitive issues that require exploration via expert evaluations for purposes of clemency and other potential habeas litigation. Numerous red flags in Mr. Beatty's background indicate the need for mental health evaluations, including the following:

- TDCJ has shuttled Mr. Beatty to the Wayne Scott Unit (formerly known as Jester IV and now often referred to as "Scott (J4)"),[1] a psychiatric unit for prisoners who need mental health interventions. In counsel's experience, death row prisoners are not transported to Scott (J4) unless they are severely mentally ill.

- Mr. Beatty was most recently sent to Scott (J4) in May of 2022 for a mental health crisis intervention. He was experiencing visual and auditory hallucinations and was placed on "crisis management status" because of suspected decompensation.

- During a recent visit at the Polunsky Unit with a member of Mr. Beatty's legal team, Mr. Beatty exhibited some of the same delusional thinking documented by prison officials before his May 2022 transfer to Scott (J4).

- The Director's staff are treating Mr. Beatty with drugs intended to control bipolar mania.

- Mr. Beatty suffers from, and is being treated for, Darier Disease. The condition is a rare skin disease caused by a genetic mutation. Research has demonstrated a statistically significant impairment in the cognitive functioning of people with Darier Disease. Mr. Beatty was first diagnosed with the disease when he was eight years old and TDCJ staff continue to treat Mr. Beatty for this condition.

---

[1] *See* https://www.tdcj.texas.gov/unit_directory/j4.html.

- At the age of five, Mr. Beatty was hit in the head with a baseball bat. The force of the blow was sufficient to dislocate his eye, a condition that persisted until it was surgically repaired seven years later.

*Beatty v. Director*, No. 4:09-cv-00225, Doc. 75 at 6–7 (E.D. Tex. Sept. 14, 2013).

29.   The need for mental health evaluations is particularly important because Mr. Beatty has never had an in-person evaluation by a mental health expert conducted by a member of his defense team, including at trial and all subsequent post-conviction proceedings.

30.   Counsel retained Dr. Bhushan Agharkar to conduct a neuropsychiatric evaluation and Dr. Daniel Martell to conduct a neuropsychological evaluation. Drs. Agharkar and Martell were approved for contact visits with Mr. Beatty under TDCJ's standard procedure.

31.   Mr. Beatty filed a motion requesting a court order that he be uncuffed during those evaluations, which Defendants opposed. *Beatty v. Director*, No. 4:09-cv-00225, Doc. 72 (E.D. Tex. Sept. 2, 2013).

32.   To support that motion, Mr. Beatty attached letters from Drs. Agharkar and Martell explaining the necessity of his handcuffs being removed during their evaluations. Ex. 3; Ex. 4.

33.   Both Drs. Agharkar and Martell have evaluated death row inmates at the Polunsky Unit numerous times without the inmate wearing handcuffs.

34.   The court dismissed Mr. Beatty's motion, finding that it lacked jurisdiction to enter the requested order. *Beatty v. Director*, No. 4:09-cv-00225, Doc. 76 (E.D. Tex. Sept. 16, 2013).

35.   Dr. Martell evaluated Mr. Beatty on September 19, 2022. Dr. Martell was unable to complete his evaluation because Defendants would not remove Mr. Beatty's handcuffs. Ex. 5 at 5. Mr. Beatty's handcuffs were also attached to a belly chain. *Id.* at 1.

36.     Dr. Martell's preliminary evaluation found that Mr. Beatty "demonstrated areas of
neurocognitive weakness," and that the "identification of deficit areas within this very
abbreviated neuropsychological test battery is a strong indication of the need for the proper
administration of a complete and comprehensive neuropsychological test battery in order to
test and characterize his neurocognitive abilities properly, and in accordance with
professional standards." *Id.* at 3, 5.

37.     The additional testing that is warranted could identify "neurocognitive deficits in several
areas including lateralized brain dysfunction, sensory-perceptual deficits, frontal
lobe/executive decision-making impairment, or problems with attention, memory, and
complex information processing." *Id.* at 5.

38.     Defendants' actions bar Dr. Martell from determining whether Mr. Beatty is intellectually
disabled. Due to the handcuffs:

> I was unable to administer any formal IQ testing. Obtaining reliable IQ
> testing is critical for the determination of Intellectual Disability pursuant to
> *Atkins v. Virginia*, and also establishes a baseline for establishing deficit areas
> when compared to his other neuropsychological test scores. Similarly, I was
> unable to administer complete academic achievement testing which is a
> critical component for establishing the adaptive deficits required to diagnose
> Intellectual Disability pursuant to *Atkins v. Virginia*.

*Id.* at 2.

39.     Dr. Agharkar evaluated Mr. Beatty on September 22, 2022. Dr. Agharkar was also unable to
complete his evaluation because Defendants would not remove Mr. Beatty's handcuffs. Ex.
6 at 2.

40.     Dr. Agharkar's preliminary evaluation found that Mr. Beatty "is clearly psychotic and has a
complex paranoid delusional belief system." *Id.* Mr. Beatty lives in a "complex delusional

world" where he believes that there is a "vast conspiracy of correctional officers who . . . 'torture' him via a device in his ear so he can hear their menacing voices." *Id.* Mr. Beatty believes that these correctional officers, some of whom are not even at the prison, "read and broadcast [his thoughts] to others." *Id.*

41.     Dr. Agharkar was unable to administer neurological tests that would have been "a valuable part" of the examination. *Id.* Those critical but unadministered tests "detect areas of abnormal brain functioning which potentially could explain Mr. Beatty's symptoms." *Id.*

42.     The evaluations by both Drs. Agharkar and Martell remain incomplete.

## Defendants' Refusal to Allow Mr. Beatty Uncuffed Evaluations is Arbitrary, Capricious, and Inconsistent with its Handling of Requests from Other Similarly Situated Inmates

43.     To the best of undersigned counsel's knowledge, Texas has never executed an inmate without providing them an opportunity to participate in a mental health evaluation while they were uncuffed. Mr. Beatty would be the first.

44.     Prior to Defendants' recent change in position, they for years allowed uncuffed contact visits with approved representatives of the legal team. Their treatment of Mr. Beatty is arbitrary, capricious, and inconsistent with their treatment of other death row inmates approaching their execution.

45.     The FPD represents a significant number of inmates on Texas's death row under 18 U.S.C. § 3599. Over the last five years, it has represented clients with 17 active execution warrants. Other than for Mr. Beatty, Defendants have allowed, through one form or another, the FPD's clients to have uncuffed contact visits with approved representatives if requested. This has included neuropsychological, neuropsychiatric, and medical evaluations.

46.     Defendants have allowed many men on Texas's death row uncuffed evaluations during approved contact visits over the years. For example, the following occurred uncuffed, without a court order, while an execution date was pending: Stephen Barbee had a neurological examination in 2021, Ex. 7 at ¶6; Randall Mays had various neuropsychiatric evaluations, including with Dr. Agharkar, *Mays v. Director*, No. 6:19-cv-00426 Doc. 1 (E.D. Tex. Sept. 18, 2019); Dexter Johnson had a neuropsychological evaluation with Dr. Martell, *Johnson v. Director*, No. 4:19-cv-03047, Doc. 1-2 at 4 (S.D. Tex. Aug. 15, 2019); and Danny Bible was uncuffed during a medical evaluation, *Bible v. Director*, 4:18-cv-01893 Doc. 1-2 at 10 (S.D. Tex. June 8, 2018).

47.     Defendants have allowed numerous other inmates to have uncuffed expert evaluations during the pendency of their execution date.

48.     Despite their recent claim that an uncuffed evaluation requires a court order, Defendants still do not consistently require one for an inmate with an execution date.

49.     For example, the Defendants allowed Melissa Lucio an uncuffed neuropsychological evaluation in February 2022. Ex. 7 at ¶5. This was after Defendants began requiring court orders for men at the Polunsky Unit.

50.     Initially Defendants refused to allow Ms. Lucio to be uncuffed for a neuropsychological evaluation. *Id.* at ¶3.

51.     However, the Defendants reversed course once her execution date was set and allowed the evaluation to occur without handcuffs. *Id.* at ¶5. They did not require a court order.

52.     Ms. Lucio was then able to use the results of her uncuffed neuropsychological evaluation to pursue relief. *Id.*

53.     In stark contrast to their treatment of Mr. Beatty, Defendants did not require Ms. Lucio to

be cuffed in other instances. She was allowed to pray—uncuffed and in the same room—with

various members of the Texas legislature. Jolie McCullough, *Listen as Melissa Lucio learns her*

*life         has         been         spared*,         TEXAS         TRIBUNE,         *available         at*

https://www.texastribune.org/2022/04/25/melissa-lucio-execution-reprieve.



54.     TDCJ went so far as to allow State Representative Jeff Leach to embrace Ms. Lucio. Rachel

Sharp, *Emotional moment Melissa Lucio learns she has been granted a stay of execution*,

INDEPENDENT, *available at* https://www.independent.co.uk/news/world/americas/melissa-

lucio-stay-execution-jeff-leach-b2065280.html.



55.     Defendants also permit death row inmates to be uncuffed in other scenarios. For example,
        Defendants have allowed death row inmates to participate in religious programming and
        medical visits uncuffed. The requested expert evaluations here pose no greater risk or threat
        to security than those.

**Defendants Frustrated and Impeded Mr. Beatty's Request for Clemency and Ability to Pursue Habeas Litigation**

56. Defendants have frustrated and impeded Mr. Beatty's ability to present information in support of clemency and ability to pursue available habeas litigation, causing injury to him.

57. The clemency process is a critical part of the justice system and is an essential fail-safe in death penalty cases. *Herrera v. Collins*, 506 U.S. 390, 415 (1993). Clemency is the appropriate—and sometimes only—method for remedying injustices that may persist after a case has made its way through the appellate process.

58. Defendants' actions interfered with Mr. Beatty's ability to present evidence that justifies commuting his death sentence. Mr. Beatty filed his application for clemency on October 19, 2022. As explained in that application, he was unable to present available information regarding his mental health due to Defendants' actions. Ex. 8.

59. Likewise, Defendants' actions interfered with Mr. Beatty's ability to prepare a state habeas application. Defendants' actions have prevented Mr. Beatty from identifying information relevant to his mental health and brain functioning that could form the basis of viable legal claims.

60. Individuals who are intellectually disabled are exempt from execution under the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002). If present, an *Atkins* claim is procedurally viable, at a minimum, in state court. The Texas Court of Criminal Appeals ("CCA") has expressly recognized that *Moore v. Texas*, 581 U.S. 1 (2017), constitutes "a new legal basis," satisfying the requirements for authorization of an *Atkins* claim presented in a subsequent habeas application under Article 11.071, § 5(a)(1). *See, e.g.*, *Ex parte Davis*, No. WR-40,339-09, 2020 WL 1557291, at *3 (Tex. Crim. App. Apr. 1, 2020) ("We have

13

previously found *Moore I* to constitute a new legal basis under Article 11.071, § 5."); *Ex parte Gutierrez*, No. WR-70,152-03, 2019 WL 4318678, at *1 (Tex. Crim. App. Sept. 11, 2019) (authorizing subsequent application under Article 11.071, § 5(a)(1) based on *Moore*). *Moore* was decided after Mr. Beatty's most recent state habeas application was filed, therefore it would constitute a new legal basis for an application under Texas law.

61.    Mr. Beatty has a potentially meritorious *Atkins* claim that could lead to relief. The testing that Dr. Martell wanted to administer "could identify indicators of intellectual disability that would be relevant" to an *Atkins* claim. Ex. 5 at 5. Defendants' actions prevented Dr. Martell from administering those tests. *Id.* at 2.

62.    Such testing is also warranted based on Mr. Beatty suffering from Darier Disease. One study found that those with Darier Disease have a sixfold increased risk of being intellectually disabled. M. Cederlof, et al., *Intellectual Disability and cognitive ability in Darier disease: Swedish nation-wide study*, (2015), *available at* <u>https://pubmed.ncbi.nlm.nih.gov/25704118</u>.

63.    Mr. Beatty is aware of TDCJ records that list his IQ in the average range. However, a prison IQ test is of little value when assessing someone's intellectual functioning—especially when limited or no information is available regarding the type of test, how it was administered, the testing conditions, or how it was scored. *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007) (finding the petitioner intellectually disabled despite the scores of 85, 92, and 80 on prison IQ tests).

64.    Yet, Defendants' actions make it impossible for Mr. Beatty to pursue this potential avenue for relief. The CCA requires a prima facie showing of intellectually disability for a subsequent habeas petition to be authorized. *Ex parte Blue*, 230 S.W.3d 151, 156 (Tex. Crim. App. 2007).

It is impossible for Mr. Beatty to make that showing because Defendants are preventing him from taking IQ and achievement testing, critical components of an *Atkins* claim. Ex. 5 at 2. Any *Atkins* claim filed now would be subject to certain dismissal due to Defendants' actions.

65. Defendants' actions preventing Mr. Beatty from having uncuffed mental health evaluations were intentional.

66. Defendants' actions preventing Mr. Beatty from having uncuffed mental health evaluations were not reasonably related to a legitimate penological interest.

## V.  CLAIMS FOR RELIEF

### Claim One: Defendants Violated Mr. Beatty's Right to Equal Protection by Arbitrarily Treating Him as a Class of One

67. Mr. Beatty incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

68. The Equal Protection Clause of the Fourteenth Amendment mandates "that all persons similarly situated should be treated alike." *City of Cleburne, Tex.* v. *Cleburne Living Center*, 473 U.S. 432, 439 (1985). An equal protection claim can be "brought by a 'class of one,' where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); s*ee Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 606 (2008) (explaining that class of one is "a claim that the State treated an employee differently from others for a bad reason, or for no reason at all").

69. There is no rational basis that relates to a legitimate government interest for Defendants to treat Mr. Beatty different that similarly situated death row inmates.

70.   Defendants have no formal policy requiring death row inmates to be handcuffed during approved contact visits.

71.   Defendants have approved, not opposed, or themselves requested uncuffed contact visits with death row inmates in numerous scenarios and continue to do so to this day.

72.   Defendants have allowed numerous similarly situated individuals on Texas's death row to have uncuffed expert evaluations to prepare for clemency and subsequent habeas litigation, including Melissa Lucio, Stephen Barbee, Dexter Johnson, Danny Bible, and Randall Mays.

73.   To the best of counsel's knowledge, no person has been executed in Texas who was not able to be evaluated by mental health professionals while not being handcuffed, if such an evaluation was sought.

74.   By virtue of the above stated facts, Defendants have deprived Mr. Beatty of his constitutional right to equal protection of law by treating him differently than similarly situated death row inmates facing imminent execution.

### Claim Two: Defendants Violated Mr. Beatty's Right to Equal Protection by Discriminating Against Him Based on His Gender

75.   Mr. Beatty incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

76.   The Equal Protection Clause can be violated by treating similarly situated men and women differently. Classifications based on gender require "an 'exceedingly persuasive justification.'" *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)). This occurs "only by showing at least that the classification serves 'important governmental objectives and that the discriminatory

means employed' are 'substantially related to the achievement of those objectives.'" *Id.* (quoting *Wengler v. Druggists Mutual Ins. Co.*, 466 U.S. 142, 150 (1980)).

77.   Defendants' conduct fails to meet this heightened standard of review.

78.   Melissa Lucio is an example of a similarly situated woman on death row receiving access to an uncuffed mental health evaluation with a pending execution date—an opportunity that Defendants have denied Mr. Beatty.

79.   Mr. Beatty has established a prima facie case of gender discrimination because Ms. Lucio is a similarly situated women with a pending execution date who Defendants allowed an uncuffed mental health evaluation. *See Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 997–98 (5th Cir. 2022) (explaining the flexible prima facie burden in gender discrimination cases).

80.   By virtue of the above stated facts, Defendants have deprived Mr. Beatty of his constitutional right to equal protection of law by discriminating against him based on his gender.

**Claim Three: Defendants Violated Mr. Beatty's Right to Due Process by Interfering with His Clemency Petition**

81.   Mr. Beatty incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

82.   The Due Process Clause provides constitutional safeguards to the clemency process, although the protections are minimal in this context. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288–89 (1998) (O'Connor, J., concurring).

83.   Due process can be violated when the State interferes with an individual's ability to present evidence in support of his application for clemency. *Noel v. Norris*, 336 F.3d 648, 649 (8th Cir. 2003) ("[I]f the state actively interferes with a prisoner's access to the very system that it

has itself established for considering clemency petitions, due process is violated."); *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) ("The Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if such a procedure is created, the state's own officials refrain from frustrating it by threatening the job of a witness.").

84.   Defendants' refusal to remove Mr. Beatty's handcuffs during his approved expert evaluations interfered with his ability to present information in his clemency petition.

85.   He has suffered an actual injury by having to file his clemency petition without this information.

86.   By virtue of the above stated facts, Defendants have deprived Mr. Beatty of his constitutional right to due process of law by interfering with the clemency process.

**Claim Four: Defendants Violated Mr. Beatty's Right to Access the Courts**

87.   Mr. Beatty incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

88.   Under the First and Fourteenth Amendments, inmates have a right to "adequate, effective and meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977), *abrogated in part by Lewis v. Casey*, 518 U.S. 343 (1996). This includes requiring "States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Id.* at 824. "[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v.*

*Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

89.    Mr. Beatty has a nonfrivolous *Atkins* claim that he cannot pursue because Defendants refuse to allow him an uncuffed evaluation. *See Casey*, 518 U.S. at 352 (requiring "that a nonfrivolous legal claim had been frustrated or was being impeded" (internal footnote omitted)).

90.    By virtue of the above stated facts, Defendants have deprived Mr. Beatty of his First and Fourteenth Amendment right to access the courts by interfering with and obstructing his ability to prepare legal pleadings.

### Claim Five: Defendants Violated Mr. Beatty's Right to Counsel

91.    Mr. Beatty incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

92.    18 U.S.C. § 3599(e) entitles Mr. Beatty to representation through "all available post-conviction process," including applications for stays of execution, competency proceedings, and clemency proceedings. *Wilkins v. Davis*, 832 F.3d 547, 557–58 (5th Cir. 2016). Available information indicates that Mr. Beatty has mental health and cognitive issues that require exploration during expert evaluations. Counsel is unable to discharge their responsibilities to Mr. Beatty under § 3599 because Defendants have rendered Mr. Beatty unable to participate in these expert evaluations.

93.    Defendants' actions have obstructed counsel's ability to pursue clemency and subsequent habeas litigation under § 3599. *See Harbison v. Bell*, 556 U.S. 180, 194 (2009) ("In authorizing federally funded counsel to represent their state clients in clemency proceedings, Congress

ensured that no prisoner would be put to death without meaningful access to the 'fail-safe' of our justice system.") (citing *Herrera v. Collins*, 506 U.S. 390, 415 (1993)).

94.   By virtue of the above stated facts, Defendants have obstructed the availability of professional representation guaranteed by § 3599.

## VI. PRAYER FOR RELIEF

Mr. Beatty requests this Court grant him the following relief:

1.   A declaratory judgment that Defendants' actions violate Mr. Beatty's constitutional and statutory rights;

2.   A preliminary and permanent injunction prohibiting Defendants from executing Mr. Beatty until they permit Drs. Agharkar and Martell to evaluate him without him being handcuffed, and until Mr. Beatty has sufficient time to utilize the results of those uncuffed evaluations to seek clemency and subsequent habeas litigation; and

3.   Any other relief this Court deems just and proper.

Respectfully submitted,

DATE: October 21, 2022

JASON D. HAWKINS
Federal Public Defender

*/s/ Jeremy Schepers*
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas Bar No. 24084578

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

*Counsel for Plaintiff*

James William Marcus
Texas Bar No. 00787963
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin, Texas 78705
512-232-1475
512-232-9197 (fax)
jmarcus@law.utexas.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States Court for the Southern District of Texas using the electronic case-filing (ECF) system of the Court. I have also sent a copy of this document to counsel for the Defendants, Assistant Attorney General Rachel Patton, via email at rachel.patton@oag.texas.gov.


*/s/ Jeremy Schepers*
Jeremy Schepers